TEXTILE DYE WORKS, INC. and GENERAL PROCESSORS, INC., Plaintiffs and Appellants, *v.* SECRETARY OF THE TREASURY, Defendant and Appellee.

No. R-66-350. Decided February 14, 1968.

O'Neill & Borges and Eduardo E. Franklin for appellants. J. B. Fernández Badillo, Solicitor General, and Peter Ortiz, Assistant Solicitor General, for appellee.

MR. JUSTICE RIGAU delivered the opinion of the Court.

This case deals with the manner in which the legislation, whose purpose is to promote the economic development of the country, should be construed.

Appellants are two domestic companies and to both the Government of Puerto Rico granted industrial tax exemption. Appellants paid, under protest, the amounts of $2,307.47 and $2,984.29 for excises in connection with certain machinery imported by them to be used in their operations, and after taking the necessary steps they appealed to the Superior Court for reimbursement. As the two cases raise the same question, they were consolidated. Appellants appeal to us from an adverse judgment in said court.

In its judgment the Superior Court sets forth the following, as part of the facts stipulated by the parties:

"Plaintiffs' business includes the dyeing, fixing, compacting by steam, and finishing the yarn of knit sweaters. When the knit sweater is received by the plaintiffs, it is not commercially marketable; its size is too large, it contains chemicals from the processes of weaving and spinning; it has the natural color of the yarn; when touched it feels greasy and lacks stability in size and form.

"Plaintiffs process three kinds of yarns, the dyeing of which requires different selection of chemicals and separate processes to obtain a marketable product. The three yarns are wool, nylon, and orlon. Each of the processes is as follows:

"(a) *Wool.* Wool is a natural fiber which is treated with acid dyes, which react chemically with the wool in a reversible[1] [*sic*] chemical reaction. Furthermore, when the wool is knitted, it is stiff and hard. It must be processed to make the yarn loose and soft.

"(b) *Nylon.* The nylon which is processed is a textured nylon yarn. Nylon is a thermoplastic material, that is, under heat and pressure it takes a shape which cannot be altered. The sweaters are placed in a heater under a 30 pound pressure and heated at a temperature of 265° F. to compact the yarn, eliminate the shrinkage, increase its resistance to shrinkage, produce a softer texture, and permit the stabilization of color in the dyeing process. This process is also irreversible.

"(c) *Orlon.* Orlon is a chemical called acrylic polymer. This yarn is dyed at temperatures over 180° F., it shrinks and more body is given to the yarn during the dyeing process."

What is copied above gives an idea of appellants' manufacturing operations. We do not believe it is necessary to copy all the stipulations of the parties. It might be convenient to add the following, which was also stipulated:

"The physical changes in size, texture, and stability of the yarn are entirely irreversible without destroying the article."

Appellants are right. Their operations are of a manufacturing nature. They are not merely "service" operations as defendant believes. If these materials and clothing articles

---

[1] Evidently this is an error in dictation. What it really means is "irreversible." See the original stipulation in civil case No. 63-2762.

were not subjected to the chemical treatment partly described in the preceding paragraphs, said materials would only be semiprocessed and could not be used by the consumer and, therefore, would not be saleable. Considering the matter from a historic point of view we must realize that our industrialization is at its early stages. We are in the process of learning. In Pennsylvania, a state which already has industrial tradition, a case very similar to the one at bar was decided. There also existed—already in 1885—a law that granted certain industrial tax exemptions. Defendant's manufacturing operations in that case were the same or very similar to those of appellants herein. The Court concluded that defendant was engaged in a manufacturing process and that the exemption was applicable to it. *Commonwealth* v. *Quaker City Dye Works Co.*, 5 Pa. C.C. 94. Said case was cited with approval in *Commonwealth* v. *Littlewood & Sons*, 44 Pa. C.C. 310. In Pennsylvania, an industrialized state, there seems to be no doubt on this particular.

The process to which appellants subject these materials and semiprocessed articles is a necessary and indispensable process which intervenes with the raw materials at a stage between the beginning and the completion of the manufacturing process of said articles. That process falls squarely within the letter and spirit of the law. The exemption claimed by appellants is the one authorized by § 46(b)(1)(a) of the Excise Act.[2] Said section provided, insofar as pertinent,

---

[2] The Excise Act of Puerto Rico, Act No. 2 of January 20, 1956; 13 L.P.R.A. § 4046(b)(1)(a). The law applicable to this case is the original text of § 46(b)(1)(a) of Act No. 2 of 1956, since that was the law in force at the time the machinery was imported. This section has been amended twice, subsequently. First, by Act No. 49 of June 18, 1958, which amended subdivision (a) of said section and which is not in controversy herein. The second and last amendment was made by Act No. 36 of May 31, 1963, which amended subdivision (b) of said § 46. As may be seen hereinafter, the 1963 amendment in nowise varies the conclusion we have reached.

that any of the following articles shall be exempt from tax when used in a manufacturing plant:.

"(a) machinery or equipment used in the factory stage of production, *relating to* the processing of materials *between the beginning and the completion of the manufacturing process* including the assemblage or integration of taxable articles under section 4004 of this title." (Italics ours.)

. Notice the wide range that the lawmaker sought to give the law, since he even included the assemblage of articles which, in the absence of express provision of law, would not be properly considered manufacturing. Likewise, in defining the term "manufacturer," the legislature in that same law which we are construing and applying herein provided that "manufacturer" means "any person engaged in the manufacture of any article, including assemblers or integrators of articles." Section 4 of the Act, 13 L.P.R.A. § 4004 (1). Is this perhaps because the lawmaker, whom we presume to be an intellectually cultivated person,[3] does not know what to fabricate and to manufacture mean? Certainly not. It is because the tax exemption on articles which are used in the manufacturing processes are intended to provide an incentive for the establishment of manufacturing plants in Puerto Rico, because this country, on account of its very high population density, cannot depend solely on the agricultural production with its limited territory[4] to create and maintain the proper standard of living for its inhabitants.[5] The economic problems of Puerto Rico, including those of industrialization as well as the use of its land, must be considered in the light of our geographic and population reality. We must keep in mind

---

[3] *People* v. *Santiago Vázquez*, 95 P.R.R. 581 (1967).

[4] Less than ⅓ of its land is tillable. Koenig, A Comprehensive Agricultural Program for Puerto Rico 48 (1953).

[5] See the Statement of Motives of Act No. 184 of May 13, 1948 (Sess. Laws, p. 482), and of Act No. 6 of December 15, 1953 (Sp. Sess. Laws, p. 12), and *Caparra Dairy, Inc.* v. *Tax Court*, 67 P.R.R. 292 (1947).

those conditions when we are requested to apply to our economic reality jurisprudence originated in other States. Puerto Rico is one of the most densely populated countries in the world, approximately 700 inhabitants per square mile. On the other hand, there are states like Montana, Wyoming, and Nevada, which have less than five inhabitants per square mile, and there are 28 states which have less than 100 inhabitants per square mile. The United States has, as a whole, only 50 inhabitants per square mile.[6]

 With the foregoing in mind, it is easy to understand that the industrial tax exemptions granted by the Government of Puerto Rico should not be interpreted as the former tax exemptions which were privileges, for which reason their restrictive interpretation was beneficial to the public interest. On the contrary, the *industrial* tax exemptions should be interpreted in consonance with their creative purpose. It is in this way alone that the legislative intent will be accomplished and, furthermore, that faithful and reasonable interpretation is the beneficial interpretation to the public interest. The industrial tax exemption is not a grace, in the old sense of the phrase, conferred by the Government of Puerto Rico, but it is an instrument utilized in Puerto Rico to promote industrial development and productive investment, all for the final goal of offering to the inhabitants of the country a civilized, material, and spiritual life.[7] Said tax exemptions are a realistic and effective tool in the strife of

---

[6] Statistical Abstract of the United States, p. 15, published by the Department of Commerce of the United States (1967); Puerto Rico Planning Board, *Anuario Estadístico* 5 (1962).

[7] Endeavoring to promote industrial investments through tax exemptions and otherwise, Puerto Rico struggles against the vigorous and attractive competition of some States of the Union and other undeveloped countries. It suffices to see the advertisements which appear in the New York Times and in publications addressed to industrialists, to realize it.

the country to eliminate the "subhuman" conditions which still exist in certain areas.[8]

The Economic Development Administrator has stated the following:

"Industrial development constitutes the basic factor of the unique economic development of Puerto Rico. The new Economic Development factories produce 67 percent of the net manufacturing income, 74 percent of our exports, 72 percent of the factory jobs, and 75 percent of the total amount of the industrial payroll."[9]

The Department of the Treasury itself admits that the process to which appellants herein subject the materials in issue is a manufacturing process. Paragraph No. 7 of the stipulation, copied in the judgment of the trial court, reads as follows:

"7. If operations identical to those performed by plaintiffs were coordinated in a total and continuous process in the manu-

---

[8] *People* v. *Berdecía Rodríguez*, decided on May 16, 1968, concurring opinion of Mr. Justice Santana Becerra.

[9] Rafael Durand, *Progreso, Problemas y Perspectivas del Desarrollo Industrial de Puerto Rico*, a publication of the Economic Development Administration of Puerto Rico (1966).

As to the direct relation existing between the industrial incentive program and the development of the Puerto Rican economy, see, among others, the following: Baer, *Puerto Rico: An Evaluation of a Successful Development Program*, 73 Q. J. of Econ. (1959); Baker, *Puerto Rico's Program of Industrial Tax Exemption*, 18 Geo. Wash. L. Rev. (1950); Barton, *Puerto Rico's Industrial Development Program 1942–60*, Center for International Affairs, Harv. University (1959); Berlin, *Puerto Rico as a Foreign Trade and Investment Center*, 14 Inter-American Economic Affairs (1960); Bathia, *Tax Exemption in a Developing Economy: A Case Study of Puerto Rico*, 13 Nat'l Tax J. (1960); Durand, *Puerto Rico— Industrial Progress in the Caribbean*, International Trade Review (1963); Goldman, *Puerto Rico's Tax Opportunities Offer Mutual Benefits*, 189 Commercial and Financial Chronicle 20ff (1959); Jaffe, People, Jobs and Economic Development: A Case History of Puerto Rico, Supplemented by Recent Mexican Experience (1959); Moscoso, *Industrial Development in Puerto Rico*, 284 Annals of the American Academy of Political and Social Science (1953), and Novak, *A New Appraisal of Puerto Rico in Light of Recent Tax Legislation*, 19 Tax L. Rev. (1964).

facturing of sweaters, they would have exemption and would not have to pay excises."

 Appellants indicate that *Tinto, Inc.*, plant, which performs here in Puerto Rico the same operations as theirs, and which also obtained industrial tax exemption, was granted, by administrative decision of the Bureau of General Excise Taxes of the Treasury Department, tax exemption on its machinery. The difference between *Tinto, Inc.*, and appellants herein, we are told, is that the holders of *Tinto* shares are also stockholders of other corporations engaged in other phases of the operation of the sweater industry. But there seems to be no doubt that the operations performed by *Tinto, Inc.*, are identical or very similar to those performed by appellants, and that they are manufacturing operations and that their machinery "intervenes" with the raw materials at some time "between the beginning and the completion of the manufacturing process" of those articles. That intervention at some time between the beginning and the completion of the manufacturing process, that is, between the time the raw material begins to be processed, until the finished article is produced, is what the law required to grant tax exemption for that machinery.[10] The law does not care who is or who is not a stockholder and does not distinguish between the different stockholders. The Department of the Treasury could not do it either. What the department had before it was plants and equipment which performed identical industrial operations. The administrative determination cannot produce contradictory solutions for fundamentally identical situations.[11]

When § 46 of the Excise Tax was amended in the year 1963, the lawmaker included, more specifically, this time, the situation at bar in stating that the machinery or equipment

---

[10] 13 L.P.R.A. § 4046(b) (1) (a), Vol. 3-A, p. 485.

[11] *South P.R. Sugar Co.* v. *Sugar Board; Mercado, Int.*, 82 P.R.R. 814, 833 (1961).

used in manufacturing plants shall be exempt from tax, and in giving three definitions of what the term "manufacturing plant" should mean, he included the following:

"A manufacturing plant exempt under the Industrial Incentive Act of 1954, the Industrial Tax Exemption Act of 1948, and any other exemption act subsequently approved for the same purposes." Sess. Laws 1963, p. 55.

Naturally, that was to be expected. When an industrial plant is granted industrial tax exemption, it has already passed through a tight-meshed administrative sieve. In order that tax exemption be granted, the applicant must qualify under the terms of the Industrial Incentive Act, he shall submit statements of accounts and affidavits, he must appear at a public hearing in the Industrial Tax Exemption Office, and should accept a series of conditions. The notice of the hearing is previously published in two papers of general circulation. The applicant shall report, under oath, the amount of the original investment, the employment opportunities to be offered, the amount of the annual payroll, the equipment to be utilized and its cost, and shall explain in detail what its operations in Puerto Rico will consist in. Good labor relations are also required, at least, during the last two years prior to the filing of the application.

Before deciding on any application for exemption, the Governor of Puerto Rico shall first consider, by express operation of law, the reports on each application which shall be submitted to him by the Secretary of the Treasury, the Secretary of Justice, the Secretary of Labor, and the Economic Development Administrator, and such other Commonwealth agencies as, in the judgment of the Governor, should make a report on such application. It is after he receives the report and recommendation of the Director of the Industrial Tax Exemption Office that the Governor shall approve or deny the exemption.[12]

---

[12] 13 L.P.R.A. § 252 et seq.

Actually, the Industrial Tax Exemption Office of the Government of Puerto Rico is expressly organized, equipped, and specialized for making determinations as to what is industry and what is manufacture, and what types of industries should be granted tax exemption. We have previously had occasion to point out that what is meant by to manufacture and what is meant by a new or different product, are questions to be elucidated by taking into consideration the circumstances in each case (for which the administrative proceeding aforementioned is the most adequate), and the applicable law.[13]

Lastly, we must point out that the cases cited by defendant in his brief are distinguishable from the case at bar. The case of *Francis v. Tax Court*, 74 P.R.R. 18 (1952), dealt with certain machinery which evidently was not industrial. It dealt with some mechanical conveyers and hoisters for carrying the raw sugar to certain warehouses. *Island Properties Co. v. Sec. of the Treas.*, 82 P.R.R. 842 (1961), dealt with crushed stone and the intervention with the raw material was not a phase in a process to produce a finished product, since the product was sold to builders which utilized it for the construction of works. The situation in that case is different from that in the case at bar, in which, as we have seen, the intervention with the raw material evidently occurs between the beginning and the completion of the manufacturing process. The same may be said of *Descartes, Treas. v. Tax Court, P.R. Aggregates, Int., supra,* which dealt also with an operation of stone crushing. In *Hartman Tobacco Co. v. Sec. of the Treasury,* 81 P.R.R. 603 (1959), there was involved a machine to pack tobacco. From what we previously copied from the stipulation in the case at bar, it may be seen that the situation in both cases is different.

[13] *Descartes, Treas. v. Tax Court; P.R. Aggregates, Int.,* 78 P.R.R. 83, 91 (1955).

702

As to the amount involved in this litigation, the defendant agrees that appellants are right. The amount involved is $5,291.76, that is, $2,307.47 in case No. 63-2762 and $2,984.29 in case No. 63-1518.

For the reasons stated, the judgment of the Superior Court, San Juan Part, rendered on September 12, 1966, will be reversed and another rendered sustaining the complaints and ordering the reimbursement of the excise taxes claimed.